THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* PEDRO NEGRÓN COLÓN, Defendant and Appellant.

No. 7780. Argued July 10, 1939.—Decided July 14, 1939.

*H. Miranda* and *R. Rafols Estrada,* for appellant. *R. A. Gómez, Prosecuting Attorney,* and *Luis Janer, Assistant Prosecuting Attorney,* for The People, appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the Court.

Pedro Negrón Colón was accused of murder in the second degree and found guilty of voluntary manslaughter. Against the sentence of three years and nine months imposed upon him, he took this appeal. From the evidence for The People it appears that the accused was an insular policeman who was detached in the Ward Quebrada of Camuy, where the crime took place on the night of January 2 of last year. A dance was being held at the house of Juan González, located

in the ward above mentioned. Among those present was
the accused. The deceased, Fidel Hernández, was the owner
of a guitar which he lent to one of the musicians on the
condition that it be returned to him at midnight. The dance
was celebrated in perfect order. The accused was sitting in
the dining room and the deceased who seemed to have arrived
at about 11:00 P.M., was leaning on the banister of the bal-
cony, talking to some other persons. Around 11:30 P.M. or
midnight, the musician who played the guitar had it on his
lap while he ate some candies served to him and the deceased
took the guitar and left. A short time after he left, various
persons found out that he had taken the guitar and they went
out of the house looking for Fidel to take it from him, but
as he already was somewhat far away three of the persons
who had attended the dance and the accused-policeman took
a bus that was there and went to look for him. When they
had gone but 500 meters they overtook him. The bus went
on about 20 meters after having overtaken him and then
stopped to wait for him, for he was on foot and carried the
guitar under his arm. The persons who accompanied the
policeman got off to go to the deceased but the policeman
told them to leave him with the deceased that he would take
the guitar away from him. When the deceased passed, the
accused asked him for the guitar, but the former paid no
attention and continued walking. After asking him for the
instrument once or twice more, the deceased stopped and
according to one of the witnesses for The People made a
certain movement which the witness described as a "bluff"
which consisted of a motion of his arms. Then the accused
hit him with his night-stick and he fell to the ground. Once
on the ground, the accused searched his pockets and one of
the witnesses for the prosecution testified that he saw him
take something out but that he does not know what it was.
After his pockets were searched the deceased got up and
asked the accused to return what he had taken. The accused
refused, the deceased insisted, going closer to him while the

accused retreated to get away from the deceased until finally he hit him again twice with his night-stick. He then forced him to get on the bus to take him to the hospital in Arecibo. While in the bus he again hit him with his night-stick. Deceased's condition was such that they had to take him to the clinic in a stretcher because he could not stand up. In the clinic he was cured by a nurse. Notwithstanding the fact that deceased had six different fractures in the skull, as was later proven by the autopsy, and that the nurse warned him that deceased's state was very serious and that he should leave him in the clinic, the accused insisted in taking him to jail and between two 'and three in the morning he arrived at the Municipal Jail of Camuy with him. The prisoner who was at that time in charge of the municipal jail describes the arrival of the accused in the following manner:

"Q.—On the night of January 2 or 3, 1938, did any prisoner arrive there, any arrested person?

"A.—The only person who arrived was the man that the policeman hurt. The only one.

"Q.—Tell me about that.

"A.—Well, I was outside serving the prisoners water.

"Q.—Outside?

"A.—Inside. And I slept outside in a hammock. At about two or three in the morning I felt someone knocking at my door and I said: 'One moment', and I put on my clothes and shoes and opened the door and as it has an iron door which is where they have wheels apart, while I delayed, the policeman had already hit the iron door a couple of times with his night-stick and he had opened it, and I saw the man who died.

"Q.—Where was he?

"A.—Down, laying on the ground.

"Q.—Go ahead.

"A.—Then the policeman came over and said to me: 'Take that man', and I dragged him to a cell and laid him on a cot. He was there until about five thirty A. M. when his family arrived.

"Q.—Did he sleep on the cot?

"A.—Yes, sir." T. of E. p. 49.

"Q.—At what time did the policeman arrive with him?

"A.—Between two thirty and three in the morning.

"Q.—Did he become conscious at any moment?

"A.—No, sir.

"Q.—Did he talk?

"A.—No, sir.

"Q.—Did he stand up, sit down?

"A.—No, sir.

"Q.—Did he open his eyes?

"A.—No, sir.

"In answer to questions by attorney Miranda, he testified:

"Q.—Tell me, do you remember if a certain Rufino Pérez accompanied the policeman?

"A.—Only one came with him.

"Q.—Do you remember if the policeman told you to look for something, a spread, to put under him?

"A.—He told me to put him to bed. I laid his head on some books." (T. of E. p. 50)

The accused tried to show that in killing the deceased he did so in self-defense. His evidence consisted of his testimony, the testimony of the District Chief of Police of Camuy, that of the District Chief of Arecibo, the weapons which he said he had taken from deceased, and the testimony of the latter's father, who was called by the Chief of Police of Camuy to investigate the ownership of the weapons presented by the accused. The following passage from the testimony of the accused gives us the description of what he says happened with the deceased when the latter received the blows which caused his death:

"Q.—Had you seen him commit a public offense in the dance?

"A.—Never.

"Q.—Did you see any weapon on him?

"A.—No, sir.

"Q.—Was he quiet?

"A.—Yes, sir.

"Q.—By what authority did you ask him for the guitar?

"A.—In investigating the matter of the guitar.

"Q.—Was it necessary that he give you the guitar?

"A.—I asked him for the guitar, 'Fidel, please give me the guitar, and when he turned he threw himself on me and left no room.

"Q.—He threw himself on you and did he have something in his hands?

"A.—The guitar.

"Q.—Did he strike you?

"A.—Yes, sir.

"Q.—In which hand did he hold the guitar?

"A.—He carred the guitar here and he changed to under here.

"Q.—Didn't you just say that he hit you with the guitar?

"A.—He stuck it in here and when he made the gesture he threw the guitar and it went over my head.

"Q.—Did he hit you?

"A.—He made the gesture.

"Q.—Didn't you say it went over your head?

"A.—After the guitar went over my head.

"Q.—How could this man change the guitar, throw it at you and stick his hand in his pocket?

"A.—That is no so. He tried to take a weapon out of his pocket.

"Q.—Did you see the weapon?

"A.—No, sir.

"Q.—How do you know it?

"A.—He made a gesture.

"Q.—With which hand?

"A.—With his right hand.

"Q.—With which hand did he throw the guitar?

"A.—He then grabbed the guitar and threw it.

"Q.—You then hit him with your night-stick?

"A.—Yes, sir.

"Q.—When you got off the bus those other people were going to attack him, you told them to be quiet; you then called him: 'Fidel, stop where you are; Fidel give me the guitar'. He then stuck the guitar under here and went to draw a weapon and threw the guitar at you, is that the truth?

"A.—Yes, sir.

"Q.—From his back pocket?

"A.—He made as though to draw a weapon.

"Q.—He threw the guitar at you?

"A.—I saw it all together when he made as though to draw, like this, and immediately threw it at me.

"Q.—He threw the guitar at you with his right hand?

"A.—Yes, sir.

"Q.—The weapons, did he have them on him?

"A.—Instantaneously, his hand was so fast I don't know if he carried them in his hand.

"Q.—He threw the guitar at you with his with his right hand?

"A.—I struck him then with my night-stick.

"Q.—When you hit him with your night-stick, did he fall to the ground?

"A.—Yes, sir.

"Q.—You then searched him?

"A.—Yes, sir.

"Q.—And you found . . . ?

"A.—A brass knuckle and a knife.

"Q.—In the same back pocket?

"A.—Yes, sir, the right one.

"Q.—You took them and put them in your pocket?

"A.—A little while later.

"Q.—At the moment did you show then to him?

"A.—No, I was struggling.

"Q.—When you searched him he was on the ground?

"A.—Yes, sir, but he got up immediately. I put my hand in and took them from him.

"Q.—The guitar was thrown somewhere?

"A.—And he flew on top of me trying to grab me.

"Q.—With your night-stick in your hand?

"A.—Yes, sir.

"Q.—And you knew he had no weapons?

"A.—I had taken them away from him.

"Q.—Didn't he have the guitar and you then hit him again with your night-stick?

"A.—The man always insisted, I could not compete in strength with him.

"Q.—Then he was stronger than you?

"A.—Yes, sir.

"Q.—The second time you hit with the night-stick you knew he had no weapons because you had taken them away from him?

"A.—Not very hard.

"Q.—Softly?

"A.—Yes, sir." (T. of E., pp. 61–64)

The accused denied that the nurse had told him that the condition of the deceased was serious and he accepted that deceased was neither drunk nor smelling of liquor.

The Chief of Police of Camuy only testified that on the third of January, the date on which deceased died, the accused brought him a knife the blade of which measured four inches, and a brass knuckle, and informed him that said weapons had been taken by him from the accused. That the chief called the father of the latter and showed the weapons to him and that he denied that the brass knuckle were his son's, but he accepted that the knife was his son's. The Chief of Police of Arecibo testified as to the good conduct observed by the accused while he worked under his orders, and the father of the deceased, who was called by the defense, denied emphatically that he had told the chief of police that those weapons belonged to his son and that on the contrary he stated that they were not his, because his son at no time carried weapons.

Appellant's brief is very short, consisting of three type-written pafes. It charges the commission of two errors by the lower court in refusing to give two special instructions proposed by the defense, to wit:

"1. The court erred in refusing to give the following instruction:

" 'Admitting that the policeman in arresting the deceased, had no order from any magistrate, and that a misdemeanor was involved, in other words, that the arrest was illegal, the deceased had no right to attack the accused, and once he did so the accused policeman was discharging his duty when he resisted the assault by the most effective means that he had at hand at the moment, considering the circumstances which moved the accused to make use of his night-stick so as to defend himself against deceased's assault. *People v. Rodríguez,* 48 P.R.R. 383.'

"2. The court also erred in refusing to give the following instruction:

" 'Now come the undersigned attorneys and respectfully pray that this Hon. Court give the jury the following instruction:

" 'If the gentlemen of the jury have a doubt in regard to whether the accused acted in self-defense or not, you should give him the benefit of that doubt and acquit him.' "

On the margin of the instructions denied, the court stated that it denied them because they were covered by the general instructions. The defense does not discuss the alleged errors, limiting itself to stating that in refusing them the court was moved by prejudice and committed manifest error.

██ The lower court instructed amply as to self defense. The first special instruction to which the first assignment of error refers, is substantially covered by the following given by the court:

"If you believe that it is true that deceased lent his guitar until twelve o'clock at night, and that at that time he went to the dance, of that before that time he went to the dance and took the guitar belonging to him and left with it, no person, no po-l'ceman, could legally require him to give up the instrument, and if the person who carried his guitar resisted the giving up of it in any manner which would not be more than whatever was necessary to defend his property, he was justified, even though a policeman merit more respect, because policemen are agents of public order.

"A policeman should always consider, when realizing an act, whether he is acting according to law, because if the policeman over-steps the bounds of the law and invades the rights of a citizen, then the consequences cannot be attributed solely to the fault of the cit-izen, if by the authority itself an illegal act has been started.

"I should also instruct you that a policeman may be justified when he is forced to kill in resisting force in legal acts or when he is legally trying to maintain the peace; this is called justifiable homicide. He may also use his night-stick when any citizen uses force against him, without any legal reason, but in the use of the night-stick as well as with any other instrument that may cause seri-ous corporal injury or death, public officers should observe extreme care. They should use whatever force may be necessary to quell the rebellious person, to force him to comply with his duty, or to calm him, but a policeman is never justified in overstepping the bounds of the authority conferred upon him by law, because al-though it is true that the police is a brilliant and great institution in a civilized country, it is also or can also be in case of an abuse, an institution which will provoke the hatred of the people, and when

a people have no respect for the police or the courts, then gentlemen of the jury, a social revolution is very near.'' (T. of E. p. 80.)

''The court gives·you the following instruction:

'' 'The right that a person has to resist an illegal arrest is not unlimited. Although a person against whom an attempted arrest is made may use proportionate force to resist the arrest, nevertheless, if the means he adopts are disproportionate, such a resistance becomes illegal.' '' (T. of E. p. 86.)

The court also instructed at length as to reasonable doubt. Although it did not specifically instruct the members of the jury that if they had any doubt that in killing deceased, the accused had done so in self-defense, they should acquit him, nevertheless from the contents of all the instructions in regard to reasonable doubt it may be easily seen that though perhaps it would have been better practice to give the special instruction requested, still no prejudice could have been caused the defendant in refusing it.

In the case of *People* v. *Cartagena,* 54 P.R.R. 827, 837, we said:

''The correctness or sufficiency of the instructions to the jury is not decided by considering and analyzing a certain instruction separate from the others, but by considering them as a whole, since what is said in one may explain clearly or rectify what has been incorrectly stated or omitted in another.''

The refused instruction on which the second error is based is virtually included in the following which was given by the court:

''If you gentlemen of the jury believe after weighing all the evidence as a whole, that Pedro Negrón committed justifiable homicide; or killed in self-defense, as the court has explained to you, or if you gentlemen of the jury believe that the district attorney has not proven his case; or if you gentlemen of the jury have a reasonable doubt as to the guilt of the accused, in any of these cases, you should bring a verdict of not guilty.'' (T. of E. p. 84.)

In our opinion the alleged errors have not been committed, nor any other seriously infringing the substantial rights of the accused.

Therefore, the appeal should be dismissed and the judgment appealed from affirmed.

Mr. Justice Travieso took no part in the decision of this case.